CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

July 10, 2024
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| JO L. BOARDWINE, | ) | |
| Plaintiff | ) | Civil Action No. 1:23cv00051 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| MARTIN J. O'MALLEY, | ) | |
| **Commissioner, Social Security** | ) | By: PAMELA MEADE SARGENT |
| **Administration,** | ) | United States Magistrate Judge |
| Defendant | ) | |
| | ) | |

### *I. Background and Standard of Review*

Plaintiff, Jo L. Boardwine, ("Boardwine"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were

1

the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Boardwine protectively filed her application for DIB[1] on September 14, 2021, alleging disability as of December 14, 2019, based on back pain; muscle pain; nerve pain; numbness in the arms and legs; fatigue; insomnia; kidney stones; acid reflux; depression; anxiety; and post-traumatic stress disorder, ("PTSD"). (Record, ("R."), at 20, 188-94, 213.) The claim was denied initially and upon reconsideration. (R. at 109-18.) Boardwine then requested a hearing before an administrative law judge, ("ALJ"). (R. at 119.) The ALJ held a hearing on April 17, 2023, at which Boardwine was represented by counsel. (R. at 36-71.)

By decision dated June 20, 2023, the ALJ denied Boardwine's claim. (R. at 20-31.) The ALJ found Boardwine met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2023. (R. at 22.) The ALJ found Boardwine had not engaged in substantial gainful activity since the alleged onset date.[2] (R. at 22.) The ALJ determined that Boardwine had severe impairments, namely L5-S1 radiculopathy; lumbar stenosis; cervicalgia; depression; anxiety; PTSD; and chronic headaches, but he found Boardwine did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-23.)

---

[1] Boardwine also filed an application for Supplemental Security Income, ("SSI"), on September 15, 2021. (R. at 195-99.) However, it was denied because her resources were worth more than the applicable $2,000 limit. (R. at 100-06.)

[2] Therefore, Boardwine must show she was disabled between December 14, 2019, the alleged onset date, and June 20, 2023, the date of the decision, to be eligible for benefits.

The ALJ found Boardwine had the residual functional capacity to perform light work,[3] except she could frequently stoop, crawl and climb ladders and scaffolds; occasionally kneel and crouch; have occasional exposure to cold temperatures, wetness and vibration; should avoid noise above a level-three intensity level; have frequent interaction with co-workers and supervisors, but avoid interaction with the public, except for incidental contact; and avoid group, tandem or team activities. (R. at 25.) The ALJ found Boardwine was not able to perform any past relevant work. (R. at 29.) However, the ALJ found that, based on Boardwine's age, education, work history and residual functional capacity and the testimony of a vocational expert, a significant number of jobs existed in the national economy that Boardwine could perform, including the jobs of a router, an office helper and a sorter. (R. at 30-31.) Thus, the ALJ concluded Boardwine was not under a disability as defined by the Act through the date of the decision, and she was not eligible for DIB benefits. (R. at 31.) *See* 20 C.F.R. § 404.1520(g) (2023).

After the ALJ issued his decision, Boardwine pursued her administrative appeals, (R. at 182-83, 296-301), but the Appeals Council denied her request for review. (R. at 1-5.) Boardwine then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2023). This case is before this court on Boardwine's brief filed March 20, 2024, and the Commissioner's brief filed May 15, 2024.

## *II. Facts*

Boardwine was born in 1977, (R. at 188), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a master's degree in business and past work experience as a tutor, an office manager, a family counselor, a corrections counselor, a

---

[3] Light work involves lifting objects weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2023).

driver and a home health aide. (R. at 29-30, 44.)  Boardwine testified she had a long history of mental health issues, including sexual abuse and assault and that working at a prison "brought out a lot of unresolved PTSD" and "left [her] in a PTSD episode" with overwhelming anxiety. (R. at 50-51.)  Boardwine described this as being hypervigilant all the time "in fear mode" and having flashbacks, panic attacks and bouts of depression.  (R. at 51.)  She stated that, combined with her physical problems and pain, this had left her a recluse and fearful of the public and interactions with others, including family.  (R. at 51, 60.)  Boardwine testified she had flashbacks up to eight times daily, during which could not focus on anything else, and she had panic attacks at least twice daily, during which she "black[ed] out" and lost memory and were followed by crying spells.  (R. at 59.)  Boardwine testified she had one "good day" weekly.  (R. at 61.)  She testified she had medication side effects that would impact her ability to work, including memory problems, drowsiness and mental cloudiness or lack of focus and concentration.  (R. at 61.)  Boardwine said she had been seeing her current mental health provider for the "last few years" and had seen her weekly in the "last three months," but every two weeks prior to her current PTSD "flare up."  (R. at 61-62.)

Boardwine testified she also had experienced pain for many years, including lumbar and neck pain, which caused chronic migraine headaches, requiring her to take breaks "constantly." (R. at 51.)  She also stated she had carpal tunnel syndrome, for which she had previously worn "wristband[s]," but which limited her ability to move her fingers and grab items even more.  (R. at 58.)  She said her lower back hurt the worst, which she described as a constant, deep ache with neuropathy in the legs and feet, exacerbated by sitting or standing for more than 15 minutes.  (R. at 56-57.)  She said she could do an activity for 15 to 20 minutes before having to take a break and lie down for at least an hour, which provided the most relief, but not complete relief, and she also used ice for her back pain. (R. at 51, 56.)  Boardwine testified she typically would lie down for five to six hours throughout the day.  (R. at 55.)  She described her neck pain as a stiffness, with limited range of motion, as well as constant tingling down her arms and hands, creating hand

stiffness and chronic migraines.  (R. at 57-58.)  She stated it felt like electricity coming out of her hands or wearing big gloves, and she said she had difficulty opening and picking up items.  (R. at 58.)  Boardwine said she got help with the harder housecleaning activities, like vacuuming, mopping and dusting, and her neighbor helped her with grocery shopping, but she denied needing help with personal needs.  (R. at 60.)

Boardwine testified she could sit for 15 minutes before having pain that required her to move; stand for 15 minutes; and walk for 15 to 20 minutes.  (R. at 52.)  She said she did not use any kind of assistive device.  (R. at 52.)  Boardwine said she could consistently lift and carry a gallon of milk, but anything over 20 pounds was "extremely hard."  (R. at 52-53.)  She testified she drove, but had to pull over and take breaks.  (R. at 53.)  Boardwine testified she used electronic devices, such as computers, laptops and phones, but for very short periods of time because pinched nerves in her neck caused numbness, tingling and weakness in her arms and hands.  (R. at 53.)  Boardwine testified this weakness made it difficult to unscrew a lid from a bottle.  (R. at 53.)   She also stated she loved the outdoors and planting flowers, but she could only work in her flowers for "a little bit" at a time because she had to wear a back brace.  (R. at 53.)  She said she used to love going to concerts and events, but her pain, anxiety and panic made it difficult to leave her house.  (R. at 53-54.)  Boardwine stated it took her all day to grocery shop.  (R. at 54.)  Boardwine testified she slept a total of about six hours nightly, interrupted mostly by nightmares.  (R. at 54.)  She stated the combination of physical and mental health impairments caused difficulty focusing and concentrating.  (R. at 58-59.)

Adina Leviton, a vocational expert, also testified at Boardwine's hearing.  (R. at 64-69.)  Among other things, she testified that a hypothetical individual of Boardwine's age, education and work experience, who could perform light work, except who could frequently climb ladders, ropes or scaffolds, stoop and crawl; occasionally kneel and crouch; have occasional exposure to extreme cold temperatures, wetness and vibration; should avoid exposure to noise above a level-three intensity level, which is defined as a

moderate noise level; should avoid interaction with the public, except for incidental contact, such as providing directions to a restroom or a department in a larger facility; and have frequent interaction with co-workers and supervisors, but should avoid group, team or tandem work activities, could not perform any of Boardwine's past work, but could perform the jobs of a router, a general office helper and a sorter, each existing in significant numbers in the national economy. (R. at 65-67.) Leviton testified that an individual who would be off task 15 percent of the workday or who would consistently miss one day of work monthly, could not maintain employment. (R. at 68-69.)

In rendering his decision, the ALJ reviewed records from Jo McClain, Psy.D., a state agency psychologist; Dr. William Humphries, Jr., M.D., a state agency physician; Richard Milan, Jr., Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Dr. Rollin James Hawley, M.D., a neurologist; Revival Pain Management, ("Revival"); Carilion Clinic; Melissa Peddy, L.P.C., a licensed professional counselor; Twin County Hospital; Twin County Physician Practice; Twin County Gastroenterology; Galax Family Care Center; and National Diagnostic Imaging.

a.    *Pain Management*

Boardwine began seeing Lena A. Ferris, N.P., a nurse practitioner at Revival, some time prior to December 2018 for opiate addiction maintenance treatment, as well as radical low back pain. (R. at 307-13.) It was noted Boardwine had been clean since participating in inpatient drug rehabilitation program in 2009. (R. at 310.) She saw Ferris on a monthly basis. On December 18, 2019, the first visit during the time period relevant to the court's decision, Ferris reported Boardwine had continued pain despite conservative and medical management. (R. at 390.) Boardwine's medications included Subutex, Ambien, Neurontin, Zanaflex and Lidoderm patches, which she reported provided mild to moderate symptom relief. (R. at 390.) She rated her medication side effects, which included constipation, tiredness, difficulty thinking and insomnia, as a severity of three. (R. at 390.) Boardwine denied needing assistance with activities of daily living, except for

6

housework.  (R. at 390-91.)  On examination, she was alert and in no acute distress with a neat appearance and a good affect; she had negative straight leg raise testing, bilaterally, while sitting, but pain with flexion and extension; she had a steady gait; no subluxations; normal spinal range of motion; normal paraspinal muscle strength and tone; and both lower extremities were moving against gravity, with normal stability in the hips, knees and ankles and normal range of motion without joint crepitation or pain.  (R. at 394-95.)  Medications were continued.  (R. at 395.)

Boardwine continued to treat with Revival approximately monthly from January 2020 to September 2021.  In January 2020, she listed additional medications to include Mobic, Voltaren gel and omeprazole. (R. at 396.)   Over this time, she continued to complain of back pain, and she reported receiving mild to moderate symptom relief with medications.  (R. at 396, 418, 425, 432, 439, 447, 454, 461, 468, 475, 482, 489, 496, 503, 511.)  She rated her medication side effect severity as being from a two to a four, including nausea, constipation, tiredness, difficulty thinking and insomnia.[4]  (R. at 396, 418, 425, 432, 439, 447, 454, 461, 468, 475, 482, 489, 496, 503, 511.)  Boardwine indicated needing no assistance with activities of daily living, except for housework.[5]  (R. at 396-97, 418-19, 425-26, 432-33, 439-40, 447-48, 454-55, 461-62, 468-69, 475-76, 482-83, 489-90, 496-97, 503-04, 511-12.)   Nurse practitioner Ferris consistently noted that Boardwine had continued pain, despite conservative and medical management.  (R. at 396, 418, 425, 432, 439, 447, 454, 461, 468, 475, 482, 489, 496, 503, 511.)   Boardwine repeatedly denied psychiatric symptoms, including anxiety, depression, mood changes, difficulty concentrating, sleep disturbance and suicidal thoughts, except in December and August 2020 and September 2021, she endorsed anxiety, and in September 2021, she also endorsed depression.  (R. at 400, 422, 429, 436, 443, 451, 458, 465, 472, 479, 486, 493, 500, 507,

---

[4] In May 2021, Boardwine also reported vomiting and sweating, and in August 2021, she reported sweating.  (R. at 489, 503.)

[5] On August 19, 2020, and March 10, 2021, Boardwine reported needing assistance with laundry, as well.  (R. at 433, 469.)

515.)  Over this time, Ferris diagnosed lumbosacral degenerated disc; gastroesophageal reflux disease, ("GERD"); major depressive disorder, recurrent, moderate; myofascial pain; thoracic spine pain; and leg pain.  (R. at 401, 423, 430, 437, 444, 452, 459, 466, 473, 480, 487, 494, 501, 508, 516.)  In February 2020, Ferris ordered a lumbar MRI, (R. at 423), and in March 2020, she ordered a thoracic MRI.  (R. at 430.)  The thoracic MRI, dated September 23, 2020, was normal, showing no disc herniation or evidence of stenosis.  (R. at 446.)  On October 19, 2020, Ferris noted that Boardwine would be referred for an evaluation of her mid-back pain.  (R. at 453.)  When Boardwine saw Ferris in July 2021, she reported she had been using CBD products for pain.  (R. at 496.)  At that time, Ferris referred Boardwine for vascular studies of the lower extremities.  (R. at 502.)  The following month, Ferris ordered thoracic and lumbar x-rays.  (R. at 509.)  Over this time, Ferris continued Boardwine's medications for the most part, with few changes, including discontinuing Mobic, Prilosec and Voltaren in August 2021, and prescribing Lexapro in September 2021.  (R. at 402, 423, 430, 438, 445, 453, 460, 467, 474, 481, 488, 495, 502, 509, 517.)  Boardwine's physical examinations over this time largely were unremarkable, including being alert, with a good affect and a neat appearance; having negative straight leg raise testing, bilaterally, while sitting, but having pain with flexion and extension; having a steady gait; no subluxations; normal range of motion of the spine; normal muscle strength and tone, including the paraspinal muscles; both lower extremities moved against gravity without tenderness to palpation; the hips, knees and ankles were stable; range of motion of the lower extremities was normal, without crepitation or pain; both upper extremities moved against gravity without tenderness to palpation; the shoulders, elbows and wrists were stable; range of motion of the upper extremities was  normal, without crepitation or pain; and there was no edema over any extremity.[6]  (R. at 401, 422, 429, 436-37, 443-44, 451-52, 458-59, 465-66, 473, 479-80, 486-87, 494, 501, 507-08, 515-16.)

---

[6] In March and October 2020, Boardwine had tenderness to palpation in the thoracic area; from March through May 2021, she had tenderness in the lumbar facets, bilaterally; and from March 2021 and July through September 2021, she had mild edema of both lower extremities.  (R. at 429, 451, 473, 479, 494, 501, 508, 516.)

Boardwine began seeing Dr. Emidio M. Novembre, D.O., at Revival, on November 15, 2021, for opioid dependence; back pain; insomnia; anxiety/depression; and neuropathic pain. (R. at 520.) A urine drug screen was positive only for prescribed buprenorphine. (R. at 520.) Dr. Novembre noted that Boardwine had continued pain, despite conservative and medical treatment. (R. at 520.) Boardwine reported mild to moderate symptom relief with medications, and she rated her medication side effect severity as a four, including nausea, constipation, lack of appetite, tiredness, difficulty thinking and insomnia. (R. at 522.) She reported independence in all activities of daily living, except needing help with housework and assistance using the phone. (R. at 521-22.) Boardwine endorsed anxiety and depression, but she denied mood changes, difficulty concentrating, sleep disturbance and suicidal thoughts. (R. at 525.) On examination, she was alert with a good affect and a neat appearance; there was no edema over any extremity; there was bilateral thoracic paraspinal tenderness, but normal range of motion of the thoracic spine; and she was able to move all extremities against gravity. (R. at 525-26.) Dr. Novembre added constipation; depressive disorder; insomnia; lumbago; lumbosacral spondylosis without myelopathy; thoracic back pain; and somatic dysfunction of the thoracic region to Boardwine's diagnoses. (R. at 526, 528.) He continued her medications and performed osteopathic manipulative treatment, ("OMT"),[7] for her thoracic spine pain. (R. at 527-28.) Boardwine tolerated the procedure well and was discharged in satisfactory condition. (R. at 528.)

Boardwine continued treatment at Revival through December 2022. Over this time, she continued to report mild to moderate symptom relief with medications, and she rated her medication side effect severity as a three or four. (R. at 547, 554, 561, 568, 621, 628, 635, 641, 658.) Donna Davis, N.P., a nurse practitioner, and Dr. Novembre noted that

---

[7] OMT is used to help correct structural imbalances in the body, improve circulation and relieve pain. This is accomplished by applying gentle pressure to manipulate the muscles, soft tissues and joints, encouraging the body to heal itself by ensuring that the bones and muscles are aligned and balanced properly. *See* https://my.clevelandclinic.org/health/treatments/9095-omt-osteopathic-manipulation-treatment (last visited May 22, 2024).

Boardwine had continued pain, despite conservative and medical management. (R. at 547, 554, 561, 568, 621, 628, 635, 641.) Boardwine endorsed anxiety and depression at each appointment during this time, but she consistently denied mood changes, difficulty concentrating, sleep disturbance and suicidal thoughts. (R. at 550-51, 557-58, 564-65, 571-72, 624-25, 631-32, 638-39, 644-45, 649, 662-63.) Examination findings over this time remained mostly unchanged, except Davis noted a normal mood and no thoracic spinal tenderness in February 2022, and she noted paraspinal musculature tenderness to palpation of the cervical spine in September 2022. (R. at 551, 558, 565, 572, 625, 632, 639, 645-46, 649-50, 663.) In February 2022, Davis also added lumbar radiculopathy/radiculitis to Boardwine's diagnoses, and in March 2022, Dr. Novembre added lumbar stenosis with neurogenic claudication. (R. at 566, 573.) A urine drug screen in February 2022 was positive only for prescribed buprenorphine. (R. at 561.) At that time, Davis referred Boardwine for nerve conduction studies based on worsening neuropathy, and she advised her to get a psychiatrist to follow up on her depression.[8] (R. at 567.) In March 2022, Dr. Novembre recommended a caudal epidural under fluoroscopy, as well as OMT.[9] (R. at 574.) In July 2022, a urine drug screen was positive for THC, as well as buprenorphine, and Boardwine was counseled regarding her aberrant drug-related behavior. (R. at 628, 633.) In August and September 2022, Boardwine reported she had wished she were dead or that she would not wake up. (R. at 635, 642.) However, she denied having suicidal thoughts. (R. at 636, 642.) In September 2022, Boardwine stated that, in the last three months, she had started to do something or prepared to do something to end her life, and Davis referred her to a counselor. (R. at 642.) In October 2022, Dr. Novembre recommended a diagnostic medial branch block.[10] (R. at 651.) X-rays of the lumbar spine, dated November 14, 2022, were normal, as were x-rays of the cervical spine. (R. at 652-

---

[8] There is no evidence in the record that Boardwine saw a psychiatrist.

[9] There is no evidence in the record that Boardwine had an epidural or additional OMT.

[10] There is no evidence in the record that a medial branch block was performed.

53.)  X-rays of the thoracic spine from that same date showed only minimal scoliosis.  (R. at 654.)  Boardwine's medications were continued through this period of time.[11]  (R. at 553, 560, 566, 573, 626, 633, 640, 646-47, 650-51, 663-64.)

X-rays of Boardwine's lumbar, thoracic and cervical spine, dated February 6, 2023, showed mild kyphoscoliosis, but no evidence of acute bony abnormalities.  (R. at 769-71.)  An MRI of the thoracic spine from the same date showed no acute spinal cord contusion or abnormal cord signal throughout; no spinal stenosis or disc herniation; minimal disc desiccation from T7-T10; a small endplate Schmorl's node at the superior endplate of the T12 vertebral body; and a bony hemangioma involving the T4 vertebral body. (R. at 776-77.)  MRI imaging of the lumbar spine showed no evidence of acute cord contusion or abnormal cord signal throughout; mild posterior disc bulges at the L4-L5 and L5-S1 levels, causing no significant central canal stenosis; and mild, bilateral facet hypertrophy at the same levels, causing mild, bilateral neural foramina narrowing at the L4-L5 level.  (R. at 767-68.)

###### b.    *Primary Care*

Boardwine treated with Twin County Physician Practice from January 2020 to October 2022, receiving primary care services, urgent care services and treatment from a gastroenterology practice.  In January and April 2020, she saw Elizabeth Jones, N.P., a nurse practitioner at Twin County Gastroenterology, for acid reflux with intermittent epigastric pain and nausea.  (R. at 743-48.)  Examinations were unremarkable, including no extremity edema and no obvious motor or sensory impairment, but Boardwine was hoarse.  (R. at 744, 747-48.)  Jones diagnosed GERD without esophagitis, and she continued Protonix and prescribed Pepcid.  (R. at 744, 747-48.)  In April 2020, Boardwine advised Jones she took about six ibuprofen daily for low back pain, which Jones believed

---

[11] In June 2022, Neurontin was discontinued, and Lyrica was initiated, and tramadol was initiated in October 2022.  (R. at 627, 650.)

could be causing epigastric pain. (R. at 743-44.) However, Boardwine reported not doing well on pain medications. (R. at 743.) Jones ordered an esophagogastroduodenoscopy, ("EGD").[12] (R. at 744.)

Boardwine also had multiple urgent care visits over this time for ailments not relevant to her allegedly disabling conditions.[13] In September 2022, abdominal x-rays showed no bowel dilatation or evidence of bowel obstruction, but small kidney calcifications were noted. (R. at 760.) Boardwine was diagnosed with acute diverticulitis. (R. at 706.) Her physical examinations at these urgent care visits revealed normal ambulation with a normal gait; full range of neck motion; normal extremity movement; normal muscle tone and strength; and she was alert and fully oriented with a normal mood and affect. (R. at 677, 706, 712, 732, 736, 740.)

Also over this time, on July 1, 2020, Boardwine established primary care with Galax Family Care Center. (R. at 725.) Dr. Dwynn Greenfield, D.O., noted Boardwine had asthma in the summer, which had successfully been treated with a Symbicort inhaler. (R. at 727.) He diagnosed chronic obstructive lung disease, unspecified, for which a Symbicort inhaler was prescribed. (R. at 728.) On April 15, 2021, Boardwine complained of fluid retention in her legs, intermittent chest tightness not related to exertion, hair loss, cold intolerance, fatigue and decreased energy level and sleep difficulty, for which she took Ambien. (R. at 717.) An EKG showed sinus bradycardia without evidence of ischemia. (R. at 762.) Thyroid testing was ordered. (R. at 718.) On December 9, 2021, Boardwine reported continued chronic, episodic nausea and fatigue. (R. at 699.) It was noted that thyroid testing in April was normal, and a check of Boardwine's Vitamin D level was

---

[12] There is no record of this EGD being performed.

[13] Boardwine sought treatment for a tick bite, an ear infection, an upper respiratory infection, nausea, vomiting and diarrhea and abdominal pain. (R. at 673, 705, 720, 723, 732-33, 736-37, 739.)

recommended. (R. at 700-01.) On March 9, 2022, Boardwine requested a change in her depression medication from Lexapro to Celexa due to fatigue, but with difficulty sleeping. (R. at 693.) She also wished to discontinue Ambien because it was not working. (R. at 695.) Deborah Greer, N.P., a nurse practitioner, prescribed Celexa, but advised Boardwine to discuss the discontinuation of Ambien with her pain management provider. (R. at 694.) On July 13, 2022, Boardwine complained of worsening excessive hair loss. (R. at 687.) She said her mood had improved and was stable, stating her depression was "getting there." (R. at 687.) Boardwine further reported she had stopped taking Ambien, and trazodone was working well for insomnia. (R. at 687.) Greer diagnosed depressive disorder, chronic, stable; low back pain, stable; and Vitamin D deficiency, chronic, stable, she referred her to a dermatologist for alopecia areata, she instructed her to consider a dosage increase of her depression medication, and she ordered lab work. (R. at 689.) Boardwine declined mental health counseling. (R. at 689.) Examinations performed by primary care providers over this time showed that Boardwine was alert and fully oriented, with good judgment, normal mood and affect and normal recent and remote memory; she ambulated normally with a normal gait and station; there was no extremity edema; full range of neck motion; normal muscle tone and strength; no joint tenderness or abnormality of the joints, bones or muscles; normal extremity movement; no cyanosis, edema or varicosities of the extremities; symmetric deep tendon reflexes; intact coordination and no tremor; and normal curvature of the thoracolumbar spine. (R. at 688, 694, 700, 718, 727-28.)

c.   *Neurological Treatment*

Boardwine saw Dr. Mark R. Witcher, M.D., a neurosurgeon at Carilion Clinic, for a lumbar consult on December 3, 2020. (R. at 405.) Boardwine described having worsening pain in the mid-thoracic region for more than three years. (R. at 406.) She rated her daily pain as a seven out of 10, exacerbated by looking down, standing and working and improved with rest or sleeping. (R. at 406.) Boardwine reported chiropractic care, reiki and acupuncture were helpful. (R. at 406.) On examination, she was alert and fully oriented, with a normal mood and affect, and she demonstrated understanding of the

situation. (R. at 407.)  There was normal range of motion of the lumbar spine and no tenderness to palpation; there were no deformities or edema of the lower extremities; the pelvis was stable, with no sacroiliac, ("SI"), joint tenderness to palpation; all extremities had full and symmetric strength throughout; muscle bulk and tone were normal, with no fasciculations or atrophy; there was no limp, list or pelvic tilt; sensation was symmetric to touch and pinprick in all extremities; and reflexes were symmetric in all extremities.  (R. at 407.)  Dr. Witcher noted that MRI imaging of the lumbar and thoracic spine revealed no surgical targets, and there was only minimal thoracic scoliosis.  (R. at 407.)  He diagnosed thoracic and lumbar back pain without structural anomaly, and he recommended a trial placement of a dorsal column stimulator, to which Boardwine agreed.[14]  (R. at 408.)

Nerve conduction studies, performed by Dr. Rollin James Hawley, M.D., a neurologist, on March 2, 2022, showed chronic, bilateral L5 radiculopathy, right worse than left.  (R. at 758-59.)  Dr. Hawley advised Boardwine in conservative care of her low back, including strengthening it and the abdominal muscles to help keep the low back straight at all times.  (R. at 595.)  If this did not work, Dr. Hawley stated he might to try a sedating tricyclic antidepressant at bedtime in an effort to achieve better sleep and have less neuropathic and muscle pain, in addition to less depression and secondary anxiety.  (R. at 595.)  Boardwine advised Dr. Hawley that chiropractic adjustments decreased her back pain somewhat.  (R. at 594.)  Boardwine also reported having suffered "for years" from muscle strain in her neck and tension headaches, decreased by Tylenol, but when she described seeing flashes of light and translucent wrinkles at certain times, Dr. Hawley opined these might be migraine headaches.  (R. at 594.)  He advised her to minimize her caffeine intake and to see an eye doctor to rule out any eye disease.   (R. at 594.)

---

[14] Dorsal column stimulation is a minimally invasive treatment for intractable pain in the back and extremities.  It interferes with the transmission of pain signals from the nerves to the brain. *See* https://nspc.com/treatments/dorsal-column-stimulator (last visited June 3, 2024).  There is no evidence in the record that Boardwine ever underwent placement of a dorsal column stimulator.

Examination findings included being pleasant, with mild anxiety; having positive Phalen's and reverse Phalen's signs,[15] producing right radial wrist pain; bilateral tender ulnar nerves at the elbows; 4/5 strength in all intrinsic hand muscles, bilaterally; extension of the low back caused a burning soreness of the lumbar spine; she had decreased cold sensations throughout the lower extremities, as well as decreased vibratory sensation in a stocking-glove distribution and decreased pinprick sensation over the distal medial lower extremities, bilaterally; areflexia, except for 1+/4 in the biceps and ankle jerks, bilaterally; 2+/4 knee jerks; and positive straight leg raise testing, bilaterally, while supine, but not while sitting, at 90 degrees. (R. at 594-95.) Dr. Hawley performed additional nerve conduction studies on August 29, 2022, which showed bilateral carpal tunnel syndrome; damage to the motor fibers of the ulnar nerves around the elbows; and chronic C5-C6 cervical radiculopathy contributing to neck and thoracic pain, as well as tension headaches, with left greater occipital neuralgia. (R. at 756-57.) At this time, Boardwine advised Dr. Hawley she had discontinued Neurontin and started Lyrica. (R. at 590.) She also reported reducing her caffeine intake by half, but Dr. Hawley encouraged her to discontinue it completely. (R. at 590.) When Boardwine reported continued vision issues, Dr. Hawley advised her to see an ophthalmologist. (R. at 590.) On examination, Boardwine was described as pleasant; with 4/5 strength of the hand muscles, bilaterally; positive bilateral Phalen's sign and left reverse Phalen's sign; bilateral thenar muscle grooved atrophy; areflexia, except for trace knee and ankle jerks, bilaterally; and decreased pinprick sensation distal to the elbows, bilaterally. (R. at 590.) Dr. Hawley diagnosed sensorimotor carpal tunnel syndrome, causing most of Boardwine's distal upper extremity symptoms, for which he suggested using wrist splints at night or when tempted to flex or extend the wrists. (R. at 590-91.) He noted that, if these splints did not work, Boardwine would require carpal tunnel injections or surgical releases. (R. at 591.) Dr. Hawley also

---

[15] A positive Phalen's sign, indicated from a series of movements and positions of the hands and wrists, indicates likely carpal tunnel syndrome. A reverse Phalen's sign results from a different set of motions and hand positions and also checks for symptoms of carpal tunnel syndrome. *See* https://my.clevelandclinic.org/health/diagnostics/25133-phalens-test (last visited June 3, 2024).

diagnosed damage to the motor fibers of the ulnar nerves around the elbows, causing some distal symptoms, for which he suggested not leaning on or bumping the funny bones and avoiding forceful, repeated or prolonged flexion of the elbows. (R. at 591.) Lastly, Dr. Hawley diagnosed chronic C5-C6 radiculopathy, contributing to Boardwine's neck and thoracic pain, with a component of tension headaches, with secondary great occipital neuralgia, for which he suggested holding the head straight up and forward and resting the neck. (R. at 591.) Dr. Hawley stated that, if these "simple measures" did not work, Boardwine might want to try Pamelor or nortriptyline at bedtime. (R. at 591.) Approximately a year later, on September 5, 2023, Dr. Hawley performed nerve conduction studies and an EMG of Boardwine's upper extremities, which, when compared with the August 29, 2022, study, showed persistence of a left sensory, more than motor, carpal tunnel syndrome and mild damage to the left ulnar nerve around the elbow. (R. at 9-10.) The studies also showed worsening of the chronic left C5-C6 cervical radiculopathy, which had progressed to the left C7 level, causing most of Boardwine's neck and left upper extremity symptoms, with tension headaches and left greater occipital neuralgia. (R. at 10.) Dr. Hawley suggested conservative treatment, including wearing a carpal tunnel wrist splint, as well as not leaning on or bumping the left funny bone and avoiding forceful, repeated or prolonged flexion of the left elbow. (R. at 8.) For the cervical radiculopathy, Dr. Hawley suggested holding the head straight up and forward, as well as resting the neck, and he suggested a cervical MRI. (R. at 8, 10.)

### d. Mental Health Treatment

Boardwine saw Melissa Peddy, L.P.C., a licensed professional counselor, on August 11, 2021, for an intake assessment. (R. at 412.) Boardwine was fully oriented, exhibited no signs of psychosis and was cooperative and pleasant. (R. at 414.) She reported significant daily anxiety, which was mainly situational and triggered by being in crowds and around certain people. (R. at 414.) She also reported decreased energy, fatigue, intrusive thoughts, difficulty sleeping, flashbacks, negative self-talk and multiple past suicide attempts, the most recent of which was in 2008, prior to her opiate addiction

recovery.  (R. at 414.)  Boardwine reported a history of sexual abuse and assault.  (R. at 414.)  Peddy opined Boardwine would benefit from outpatient therapy to process past traumas and to reduce anxiety.  (R. at 414.)  Peddy completed a Quarterly Review on October 27, 2021, noting Boardwine had attended six counseling sessions and missed none.  (R. at 415.)  She reported using cognitive behavioral therapy, ("CBT"), and eye movement desensitization and reprocessing, ("EMDR"), to assist Boardwine in reducing her anxiety.  (R. at 415.)  Peddy reported there had been no relapse of symptoms, that Boardwine had shown increased insight and awareness of how her past experiences had shaped her life and current experiences and that she was actively working towards reducing her distress and incorporating healthy coping and communication skills in her daily life.  (R. at 415-16.)  Peddy noted that Boardwine continued to struggle with anxiety that impacted her daily functioning and interpersonal relationships, and she would benefit from continued outpatient therapy.  (R. at 416.)  Peddy completed another Quarterly Review, covering the period from October 27, 2021, to January 26, 2022, noting that Boardwine had attended eight sessions and missed three.  (R. at 580.)  She noted that Boardwine reported increased depression and low motivation during this quarter and Peddy noted there had been a relapse of symptoms.  (R. at 580.)  She continued to use EMDR, and Boardwine continued to struggle with depression and anxiety regularly.  (R. at 581.)  Peddy recommended continued therapy.  (R. at 581.)  On November 27, 2021, Peddy prepared a Letter Regarding Services Provided, noting that Boardwine continued to struggle with symptoms of PTSD and generalized anxiety disorder, stating she exhibited difficulty with concentration in sessions at times and that she reported difficulty with concentration in her daily life due to past trauma and anxiety, which, at times, impacted her memory.  (R. at 578-79.)  Boardwine reported stress in her relationships due to anxiety, but she was practicing healthy communication skills in her relationships in order to help manage her anxiety.  (R. at 579.)  She reported continued nightmares and flashbacks related to her trauma, and Peddy stated she benefitted from a slower pace and allowing time for reflection and consideration.  (R. at 579.)

On March 10, 2022, Peddy completed another Letter Regarding Services Provided, stating that, since February 15, 2022, Boardwine had reported poor sleep and having enuresis at times. (R. at 583.) She reported feeling "blah," as if her Lexapro was not working as well as it could be, which Peddy encouraged her to discuss with her primary care provider, which she did on March 9, 2022. (R. at 583.) Peddy noted that Boardwine continued to engage in EMDR, but she continued to struggle with symptoms of PTSD and generalized anxiety disorder. (R. at 583.) She again noted that Boardwine exhibited difficulty with concentration in sessions at times and asked for questions or statements to be repeated, and she reported difficulty with concentration in her daily life. (R. at 583.) Peddy stated that, at times, Boardwine's difficulty concentrating impacted her memory. (R. at 583.) Boardwine reported continued relationship stress, but she had been practicing healthy communication skills. (R. at 583.) Peddy again stated Boardwine would benefit from a slower pace and time for reflection and consideration. (R. at 583.) On June 24, 2022, Peddy completed a Notice of Pending Action, in which she stated Boardwine's last appointment attended was March 9, 2022, and she must contact her if she desired counseling or she would be discharged from treatment. (R. at 598.)

Over her treatment of Boardwine, Peddy diagnosed generalized anxiety disorder; PTSD, chronic; and opioid abuse, in remission. (R. at 412, 415, 580, 582, 598.) Peddy completed another Quarterly Review on February 7, 2023, for the period from September 21, 2022, to December 21, 2022, noting that Boardwine reported feelings of excessive guilt, increased depression, increased crying spells and fleeting intrusive thoughts about not living anymore at the beginning of the quarter. (R. at 611.) However, she denied suicidal ideations, plans or intent, as well as nonsuicidal self-injurious thoughts or plans. (R. at 611.) Peddy stated Boardwine had a relapse of symptoms, noting her symptoms had significantly increased, as had her negative cognitions related to her view of herself. (R. at 612.) Peddy's diagnoses remained unchanged, and she opined Boardwine would benefit from further counseling. (R. at 611-12.)

Peddy also completed a Medical Source Statement on March 1, 2023, finding that Boardwine had an unlimited or very good ability to be aware of normal hazards and take appropriate precautions; a limited, but satisfactory, ability[16] to carry out very short and simple instructions; to make simple, work-related decisions; to ask simple questions or request assistance; and to interact with the public; a seriously limited ability[17] to remember work-like procedures; to understand and remember very short and simple instructions; to maintain regular attendance and be punctual within customary, usually strict tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being unduly distracted; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and to deal with normal work stress; and she was unable to meet competitive standards[18] in her ability to maintain attention for two-hour segments; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 773-74.)  Peddy opined that Boardwine's psychiatric condition exacerbated her experience of pain or other physical symptoms.  (R. at 774.)  She opined that Boardwine frequently experienced symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks.  (R. at 774.)  Lastly, Peddy opined Boardwine would be absent from work more than four days monthly due to her impairments or treatment therefor.  (R. at 774.)  Peddy based her findings on Boardwine's reported physical pain, the fact that she had missed

---

[16] A limited, but satisfactory, ability is defined on this Statement as having "noticeable difficulty (e.g. distracted from job activity) no more than 10 percent of the workday or work week." (R. at 773.)

[17] A seriously limited ability is defined on this Statement as having "noticeable difficulty (e.g. distracted from job activity) from 11 to 20 percent of the workday or work week."  (R. at 773.)

[18] Unable to meet competitive standards is defined on this Statement as having "noticeable difficulty (e.g. distracted from job activity) from 21 to 40 percent of the workday or work week." (R. at 773.)

appointments due to her physical health and that she exhibited physical pain during sessions.  (R. at 774.)

    e.  *State Agency Consultants*

Jo McClain, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on December 14, 2021, in connection with Boardwine's initial disability claim, finding that her mental impairments were nonsevere.  (R. at 77-78.) McClain opined Boardwine was mildly limited in her ability to understand, remember or apply information; to concentrate, persist or maintain pace; and to adapt or manage herself; and moderately limited in her ability to interact with others.  (R. at 77.)  McClain explained that, while Boardwine alleged anxiety that prevented her from socializing or leaving home frequently, as well as depression, which sometimes resulted in a lack of motivation to groom herself, she routinely arrived to monthly pain management sessions well-groomed and normal in appearance, and she consistently denied any severe mental health symptoms. (R. at 77.)  McClain stated that Boardwine had recently begun seeing a counselor and taking Lexapro, from which she reported no negative side effects, that she had not required intensive treatment or hospitalization for her mental health impairments and, although she alleged bouts of severe depression leading to multiple suicide attempts, these subsided once she recovered from her opioid addiction.  (R. at 77.)  McClain concluded that Boardwine demonstrated improving mental health symptoms, but she limited her to occasional public contact, given her continued reports of difficulty with crowds.  (R. at 77.)

On December 20, 2021, Dr. William Humphries, Jr., M.D., a state agency physician, completed a physical assessment of Boardwine, finding she could lift and/or carry items weighing up to 50 pounds occasionally and up to 20 pounds frequently; stand and/or walk a total of six hours in an eight-hour workday; sit a total of six hours in an eight-hour workday; frequently climb ladders, ropes or scaffolds, stoop and crawl; occasionally kneel and crouch; and climb ramps and stairs and balance on an unlimited basis.  (R. at 78-80.) Dr. Humphries found Boardwine had no manipulative, visual or communicative

limitations. (R. at 79.) Dr. Humphries based these findings on Boardwine's ongoing thoracic pain without stenosis, with recommendation of a stimulator; a past history of a left femur tumor; allegations of moderate thoracic and lumbar pain; and allegations of neuropathic pain of the legs and arms. (R. at 79-80.)

On June 14, 2022, Richard J. Milan, Jr., Ph.D., another state agency psychologist, completed a PRTF in connection with the reconsideration of Boardwine's claim, which mirrored that of McClain. (R. at 87-88.) Milan explained that the evidence showed Boardwine had some symptom improvement with treatment and, overall, examinations showed stable mental status findings. (R. at 88.) Milan also completed a mental assessment, finding Boardwine had no understanding and memory limitations; no concentration and persistence limitations; and no adaptation limitations. (R. at 91.) He found she was limited in her ability to socially interact, noting moderate limitation in the ability to interact appropriately with the general public. (R. at 91.) Thus, Milan found Boardwine could have occasional contact with the general public. (R. at 91.) In all other areas of social interaction, she was deemed not significantly limited. (R. at 91.) On June 15, 2022, Dr. Joseph Duckwall, M.D., a state agency physician, completed a physical assessment of Boardwine, which mirrored that of Dr. Humphries, except Dr. Duckwall also imposed the environmental limitations that Boardwine should avoid concentrated exposure to extreme cold and vibration. (R. at 89-91.) In addition to the reasons stated by Dr. Humphries as the bases for his findings, Dr. Duckwall also noted Boardwine's report of using a back brace when not lying down, but that overall, examinations showed a normal gait, strength and station; and that her GERD, insomnia and fatigue were treated and resulted in only mild limitations. (R. at 89-90.) Dr. Duckwall further noted that Boardwine lived alone, drove and performed light housework and meal preparation and cared for a dog. (R. at 90.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Boardwine argues the ALJ erred by improperly evaluating the opinion evidence. (Plaintiff's Brief at 8-9.) Specifically, she argues the ALJ improperly discounted the opinion of counselor Peddy, her treating mental health provider. (Plaintiff's Brief at 8-11.) Boardwine further argues the ALJ erred by failing to conduct a proper function-by-function analysis of her work-related abilities when assessing her residual functional capacity. (Plaintiff's Brief at 11-13.)

For DIB cases filed on or after March 27, 2017, the ALJ evaluates medical opinions in accordance with 20 C.F.R. § 404.1520c.[19]  Consideration of medical opinions is expressed in terms of how persuasive they are.  *See* 20 C.F.R. § 404.1520c(b) (2023). Medical opinions are evaluated for supportability, consistency, relationship with the claimant (including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship and examining relationship), specialization and other factors that tend to support or contradict a medical opinion.  The most important factors are supportability[20] and consistency.[21]  *See* 20 C.F.R. § 404.1520c(b), (c) (2023).  The ALJ does not defer or give any special evidentiary weight to any medical opinion or prior administrative medical finding, including those from a

---

[19] *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

[20] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).  "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1).

[21] "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim."  Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).  "The more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

claimant's medical sources.[22]  *See* 20 C.F.R. § 404.1520c(a) (2023).  Although the amended regulations no longer discuss the "weight" given to medical opinions, the ALJ's reason for finding an opinion persuasive or unpersuasive still must be supported by substantial evidence.  When a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3).  When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

---

[22] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2023). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2023).

Here, the ALJ found Boardwine had the residual functional capacity to perform light work, except she could frequently stoop, crawl and climb ladders and scaffolds; occasionally kneel and crouch; have occasional exposure to cold temperatures, wetness and vibration; should avoid noise above a level-three intensity level; have frequent interaction with co-workers and supervisors, but avoid interaction with the public, except for incidental contact; and avoid group, tandem or team activities.  (R. at 25.)

Boardwine first argues the ALJ erred by improperly evaluating the medical opinion of licensed professional counselor Peddy by: offering no specific evidence to support his finding of unpersuasiveness; characterizing her complaints of difficulty with concentration as "subjective"; and failing to consider Peddy's status as a treating mental health provider. In March 2023, Peddy opined, among other things, that Boardwine was seriously limited in her ability to perform 10 of the mental abilities evaluated necessary to perform unskilled work and that she would be unable to meet competitive standards in three abilities.  (R. at 29, 773.)  In his decision, the ALJ acknowledged that, while Peddy noted Boardwine's subjective complaints regarding concentration, the general treatment records indicated generally normal psychiatric findings, and there were no clinical findings to support such great limitations.  (R. at 29.)  According to Boardwine, the ALJ's "vague and unsupported" reference to "general treatment records" and "no clinical findings" precludes this court from conducting a meaningful review.  However, for the following reasons, I disagree.

It is well-settled that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion," and the failure to do so is grounds for remand.  *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  An ALJ's failure to "specify what treatment history or evidence does not support a particular opinion means 'the analysis is incomplete and precludes meaningful review.'"  *Knapp v. Colvin*, 2016 WL 4447836, at *3 (W.D. Va. Aug. 1, 2016) (quoting *Monroe*, 826 F.3d at 191), *report and recommendation adopted*, 2016 WL 4482419 (W.D. Va. Aug. 23, 2016).  However, it also is well-settled that the regulations do not require the

ALJ to use any "particular language or adhere to any particular format" in his decision in considering the supportability and/or consistency of a medical opinion, *Woodson v. Berryhill*, 2018 WL 4659449, at *6 (E.D. Va. Aug. 7, 2018), *report and recommendation adopted*, 2018 WL 4658681 (E.D. Va. Sept. 27, 2018). Instead, an ALJ must comply with a "reasonable articulation standard" that enables "a reviewing court to trace the path of an adjudicator's reasoning, and will not impede a reviewer's ability to review a determination or decision, or a court's ability to review [the ALJ's] final decision." 82 Fed. Reg. 844-01 at 5858. Considering the ALJ's decision in its entirety, as this court must, I find that the ALJ built the requisite accurate and logical bridge from the evidence to his conclusion. Specifically, the ALJ divided his decision into sections, discussing Boardwine's physical impairments and mental impairments separately. As stated above, in finding Peddy's medical opinion unpersuasive, the ALJ noted that Peddy's disabling limitations were not supported by the general treatment records, which indicated Boardwine was generally normal, psychiatrically. The court may reasonably infer that the "general treatment records" to which the ALJ was referring were Boardwine's physical treatment notes. In reviewing the portions of the decision dealing with her physical impairments, the ALJ makes clear reference to clinical examinations, providing their locations in the record. For instance, he refers to a December 18, 2019, note from Revival, which indicates Boardwine was neat in appearance, alert and had a good affect and that she denied anxiety, depression, mood changes, difficulty concentrating, sleep disturbance and suicidal thoughts. (R. at 26, 394.) The ALJ then states that Boardwine continued to treat with Revival, whose treatment records were rather benign. (R. at 26-27.) Such a statement from the ALJ, thus, encompasses the treatment notes going forward from December 18, 2019, which show that Boardwine endorsed anxiety and depression on some occasions, but her examinations consistently revealed no psychiatric abnormalities. Boardwine also consistently reported mild to moderate symptom improvement with her medications, and her pain management providers characterized her treatment as nothing more than "conservative and medical management." "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.3d 1163, 1166 (4th Cir. 1986). These treatment

notes further reveal that Boardwine denied needing assistance with her activities of daily living, except for housework. Despite a recommendation in February 2022 that she start following with a psychiatrist for her depressive disorder, Boardwine provided no records showing she ever did so.

The ALJ, likewise, specifically referenced an examination by Dr. Witcher, a neurosurgeon, indicating Boardwine was alert and fully oriented, with a normal mood and affect, and she demonstrated understanding of the situation. (R. at 27, 407.) The ALJ also referenced Dr. Hawley's March 2, 2022, treatment notes, in which he stated Boardwine took Lexapro and saw a therapist for chronic depression, but he described her as lovely and pleasant, with an attractive appearance and having only mild anxiety. (R. at 27, 594-95.) Next, the ALJ referenced a July 13, 2022, treatment note from Boardwine's primary care provider, in which Boardwine reported an improved and stable mood with daily Celexa, and trazodone was "working well" for her insomnia. (R. at 27, 687.) *See Gross*, 785 F.3d at 1166. She denied anxiety, sleep disturbances and suicidal thoughts, and nurse practitioner Greer noted she was alert, with a normal mood and affect. (R. at 688.) Boardwine's chronic depressive disorder and insomnia were deemed stable, and she declined counseling. (R. at 689.) Lastly, the ALJ found the prior administrative medical findings of the state agency psychological consultants, McClain and Milan, to be persuasive. (R. at 28.) "… State agency … psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1) (2023). They found that Boardwine was mildly limited in her ability to understand, remember or apply information; to concentrate, persist or maintain pace; and to adapt or manage herself; and moderately limited in her ability to interact with others. (R. at 77, 87-88.) Milan additionally found that Boardwine was moderately limited in her ability to interact appropriately with the general public and restricted her to occasional contact therewith. (R. at 91.) He imposed no limitations on Boardwine's understanding and memory; concentration and persistence; or adaptation. (R. at 91.) The ALJ stated these prior administrative findings were supported by detailed explanations. (R. at 28.) As stated

herein, and which will not be repeated here, both state agency psychologists did, in fact, cite various reasons to support their findings.  (R. at 77, 87-89.)  Additionally, the ALJ found that these prior administrative medical findings generally were consistent with the treatment records reflecting that Boardwine had some anxiety dealing with people due to PTSD.  (R. at 28.)  Based on the mental status examination findings cited above, I find that this is supported by substantial evidence.

Boardwine also argues the ALJ erred by characterizing her complaints of difficulty concentrating as "subjective," and she contends that her testimony and statements regarding her debilitating symptoms do not require objective findings to be deemed credible.  However, I find no error.  Boardwine is correct that Social Security Ruling 16-3p states, in relevant part, that "we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms *solely* because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual []."  Social Security Ruling, ("S.S.R."), 16-3p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013), 2017 WL 5180304, at *4 (Oct. 25, 2017) (emphasis added).  However, a claimant's allegations "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment."  *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996).  Here, the ALJ did not disregard Boardwine's allegations of difficulty with concentration solely because they were not supported by objective medical evidence, but because they were inconsistent with it.  In particular, the ALJ acknowledged Boardwine's reports to Peddy of some difficulty with concentrating and remembering, as well as Peddy's observation that Boardwine had difficulty with concentration at times during counseling sessions.  (R. at 28.)  However, as noted herein, the treatment records from her pain management provider consistently reflect that she denied issues with concentration, and she reported to treating medical sources that she was independent in the vast majority of daily activities, including those requiring concentration, such as shopping, managing medication, driving and managing finances.  On two Function Reports, dated September 27, 2021, and March 15,

2022, Boardwine stated she lived alone, cared for a pet without assistance, needed no reminders to take her medication three times daily, prepared quick meals for herself daily, performed light housework with breaks, shopped in stores, paid bills, counted change, handled a savings account and could use a checkbook/money orders, spent time with her boyfriend weekly and attended medical appointments and counseling independently, although she needed reminders.  (R. at 220-24, 251-55.)

For these reasons, I find that the ALJ properly considered Boardwine's allegations of difficulty concentrating and Peddy's reports of such difficulty at some sessions, but found they were inconsistent with other evidence in the record.

Lastly, in considering Peddy's opinion, Boardwine also argues the ALJ erred by failing to consider her status as a treating mental health provider.  The regulations are clear that supportability and consistency are the two main factors in making a determination regarding a medical opinion's persuasiveness.  *See* 20 C.F.R. § 404.1520c(b), (c).  The regulations further obligate the ALJ to address these two factors, which the ALJ here did. While the extent of a source's treating or examining relationship with the claimant, the length and purpose of the relationship, the frequency of examinations and any specialization of the source are among the factors used in evaluating medical opinions, the ALJ is not required to explain how he considered them.  The ALJ may comment on these factors, but generally has no obligation to do so.  *See* 20 C.F.R. § 404.1520c(b)(2)-(3). Thus, I find that the ALJ did not err in failing to explicitly consider Peddy's status as a treating mental health provider.  Also, the regulations prohibit the ALJ from deferring to or giving any special evidentiary weight to a medical opinion, including those from a claimant's medical source. *See* 20 C.F.R. § 404.1520c(a).

For all these reasons, I find that the ALJ did not err in his consideration of Peddy's medical opinion, and substantial evidence supports his determination that it was

unpersuasive. He built an accurate and logical bridge from the evidence to his conclusion, thereby allowing meaningful review by this court.

Next, Boardwine argues the ALJ erred by failing to conduct a function-by-function analysis as it relates to her alleged manipulative limitations. For the reasons that follow, I find that substantial evidence supports the ALJ's decision not to include any such limitations in his residual functional capacity finding. Specifically, Boardwine argues that the ALJ erred by failing to include any manipulative limitations, despite describing significant objective evidence from Dr. Hawley's March and August 2022 examinations and nerve conduction studies establishing carpal tunnel and chronic cervical radiculopathy as medically determinable impairments. Boardwine is correct that the ALJ recited these findings in detail in his decision, as set out herein. (R. at 27.) According to Boardwine, however, despite the ALJ's recitation of this overwhelming evidence, he failed to conduct a function-by-function analysis, thereby depriving this court of any meaningful review and making it impossible to determine the ALJ's reasoning for omitting manipulative limitations from his residual functional capacity finding. *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). In support of her argument, Boardwine also points to Social Security Ruling 96-8p, which states that adjudicators "…must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." S.S.R. 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013), 1996 WL 374184, at *7 (July 7, 1996).

It is true that in assessing a claimant's residual functional capacity, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the residual functional capacity may be stated "in terms of the exertional levels of work. …" *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p, 1996 WL 374184, at *1); *see also Monroe*, 826 F.3d at 188-89 (emphasizing the ALJ must "build an accurate and logical bridge from the evidence to his

conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and, if so, how often) (citation omitted). In *Mascio* and *Monroe*, the court remanded because the ALJ failed to adequately explain how he arrived at conclusions regarding the claimant's residual functional capacity. *See Mascio*, 780 F.3d at 636; *Monroe*, 826 F.3d at 189. The ALJ's residual functional capacity assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in the residual functional capacity finding. *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p, 1996 WL 374184, at *7). Here, as stated above, Boardwine argues, specifically, that the ALJ failed to perform a proper function-by-function analysis of her ability to perform manipulative activities. Based on my review of the record, I find that Boardwine's argument fails.

First, *Mascio* does not set out "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." 780 F.3d at 636. Instead, remand should be considered "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). Thus, Boardwine cannot claim error simply because the ALJ did not explicitly set forth a detailed analysis for each of her functional abilities as long as the ALJ's conclusions are ascertainable from his narrative discussion and supported by the record. I find this is the case.

It is clear from the ALJ's decision that he thoroughly considered the evidence pertaining to Boardwine's ability to perform manipulative activities, and he built a logical bridge from the evidence to his conclusions. As the Commissioner states in his brief, Boardwine concedes that the ALJ cited her two visits with Dr. Hawley, a neurologist, in 2022, which showed some abnormalities, but nothing characterized as severe. (R. at 27.) The ALJ then proceeded to weigh this evidence against the remainder of the record

31

evidence in determining Boardwine had no manipulative limitations.  For instance, he noted that Boardwine had received conservative treatment from a pain management provider since at least 2019, to whom she reported specific complaints of upper back pain and chronic radicular pain since at least February 2020. (R. at 26, 307, 418.)  Nonetheless, objective testing, including a thoracic MRI was normal, and physical examination findings yielded no upper extremity abnormalities. (R. at 446, 486.)  Moreover, the ALJ correctly stated that Boardwine failed to follow through with a neurologist's recommendation to try a dorsal column stimulator in December 2020 for upper thoracic pain. (R. at 27, 408.)  At that same visit, Boardwine reported that conservative treatment modalities, including chiropractic care, reiki and acupuncture improved her pain.  (R. at 27, 406-08.) Additionally, although Dr. Hawley's March 2022 examination reflected some abnormal findings, as acknowledged by the ALJ, he correctly noted that the remainder of his examination findings were normal. (R. at 27, 595.)  Moreover, in his decision, he cited July 2022 examination findings from Boardwine's primary care provider showing full range of motion of the neck with no tenderness and that at her last visit with Dr. Hawley in August 2022, he recommended only conservative treatment for her cervical spine and carpal tunnel issues, including resting her neck, holding her head straight and using wrist splints. (R. at 27, 590, 688.)  Dr. Hawley suggested some more aggressive measures Boardwine could try if these things did not work, but at the time of the ALJ's decision almost a year later, she had neither returned to Dr. Hawley or any other neurologist, nor had she sought any more aggressive treatment. (R. at 27, 591.)  The ALJ also noted Boardwine's February 2023 thoracic MRI, showing no acute findings. (R. at 28, 765.)

Finally, the ALJ found that the prior administrative medical findings of state agency physicians, Drs. Humphries and Duckwall, were partially persuasive. (R. at 78-79, 89-91.) They opined Boardwine could perform medium work with some postural, but no manipulative, limitations. (R. at 78-79, 89-91.)  The ALJ explained that they supported their findings with detailed explanations. (R. at 29.)  For instance, as stated herein, they noted Boardwine's ongoing thoracic pain without stenosis, for which a stimulator was

recommended; her history of a left femur tumor; allegations of moderate lumbar pain and neuropathic pain in the arms and legs; and use of a back brace when not lying down. (R. at 78-79, 89-90.) Dr. Duckwall also noted, however, that Boardwine's examinations, overall, showed a normal gait, strength and station; that her GERD, insomnia and fatigue were treated and resulted in only mild limitations overall; and she was able to live alone, drive, care for her house/meals and care for a dog. (R. at 89-90.) The ALJ also found that the state agency physicians' findings were partially consistent with the treatment records, concluding that Boardwine could perform only light work and was additionally restricted from working around loud noise. (R. at 25-29.) As stated above, "… State agency medical … consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1). These prior administrative medical findings also serve to support the ALJ's decision not to impose any manipulative limitations in his residual functional capacity finding.

Only after thoroughly analyzing all of the relevant evidence did the ALJ reasonably conclude that the record required no greater physical limitations than contained in the residual functional capacity finding. (R. at 28.) It is clear from the ALJ's decision that he did not err by failing to perform a function-by-function analysis relative to Boardwine's ability to perform manipulative activities. Instead, I find that he followed the regulations, that his conclusions are ascertainable from his narrative discussion and supported by the record, thereby allowing for meaningful review by the court, and substantial evidence supports his residual functional capacity finding.

I further note that the ALJ did not find that Boardwine's carpal tunnel syndrome was a severe impairment, a finding that Boardwine does not challenge in her brief. To qualify as a nonsevere impairment, an impairment must not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a) (2023). It also is important to note that none of Boardwine's medical treatment providers placed any manipulative limitations on her work-related abilities.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's consideration of the medical opinion evidence and prior administrative medical findings;

2.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Boardwine was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      July 10, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE